Darrell **ELLIOTT**, and Jean Elliott,
His Wife, Appellants,

v.

Jeaneen Marie **IONTA**.

Superior Court of Pennsylvania.

Argued June 8, 2004.
Filed Feb. 16, 2005.

Anthony A. Seethaler, Pittsburgh, for appellants.

Leo M. Stepanian II, Butler, for appellee.

BEFORE: FORD ELLIOTT, TODD, and PANELLA, JJ.

OPINION BY FORD ELLIOTT, J.:

¶ 1 Darrell Elliott and Jean Elliott appeal from the judgment entered on September 23, 2003. We reverse and remand for a limited new trial on damages.

¶ 2 Appellants brought this action to recover damages for injuries allegedly sustained as a result of a motor vehicle accident on December 20, 1998. Prior to trial, the court determined that appellee was negligent as a matter of law; therefore, the only issues before the jury were whether the accident was the proximate cause of appellants' injuries, and if so, the proper amount of damages. Appellant Darrell Elliott ("Husband") was stopped at an intersection on Route 68 westbound when he was rear-ended by appellee. Husband's alleged injuries stemming from the accident included cervical lordosis, a cervical strain/sprain, depression, sleeplessness, loss of sexual function, an exacerbation of his pre-existing diabetes, and migraine headaches.

¶ 3 After hearing all the evidence, the jury determined that the accident was not the cause of appellants' injuries. Counsel for appellants, Anthony A. Seethaler, Esq., moved for a mistrial, arguing that the jury's verdict was against the weight of the evidence, specifically that presented by appellee's medical experts. The Honorable Thomas J. Doerr, P.J., declined to rule on the motion at that time and instructed counsel to file a written motion. On May 19, 2003, appellants filed a timely motion for a new trial. After hearing argument on the motion, it was denied on September 11, 2003. Judgment was entered for appellee on September 23, 2003, and appellants filed a timely notice of appeal on October 20, 2003.

¶ 4 Appellants present the following issues for this court's review:

1. Did [appellants] waive their right to a new trial?
2. Should the new trial on damages encompass all injury claims?

Appellants' brief at 4.

¶ 5 In his opinion and order of September 11, 2003 denying appellants' post-trial motion, Judge Doerr stated that the issue was waived. It was the trial court's opinion that appellants had failed to make a specific objection to the verdict before the jury was excused, and therefore the issue was not preserved for review. (Trial court opinion, 9/11/03 at 2–4, citing *City of Philadelphia, Police Dept. v. Gray,* 534 Pa.

467, 633 A.2d 1090 (1993); *Curran v. Greate Bay Hotel and Casino*, 434 Pa.Super. 368, 643 A.2d 687 (1994), *allocatur denied*, 539 Pa. 678, 652 A.2d 1323 (1994).) The trial court also stated that had the issue been preserved, a new trial should be limited to only those injuries which were uncontroverted. (Trial court opinion, 9/11/03 at 4–5.)

■ ¶ 6 In its 1925(a) opinion filed December 10, 2003, however, the trial court acknowledges that appellants' claim was indeed preserved for review by filing post-trial motions. (Trial court opinion, 12/10/03 at 2–3, citing *Criswell v. King*, 575 Pa. 34, 834 A.2d 505 (2003).) In *Criswell*, our supreme court determined that a weight of the evidence claim need not be proferred before discharge of the jury in order to preserve the challenge for post-verdict and appellate review:

> Verdict-related claims arising from perceived evidentiary weight cannot be addressed and averted by resubmission to the same jury. Since the complaint cannot be redressed by the jury, there is no reason, under the principles animating *Dilliplaine* and its progeny, to require an objection before the jury is discharged. Nor should a party be forced to litigate a claim of verdict inconsistency when in fact its true complaint sounds in evidentiary weight.

*Id.* at 48, 834 A.2d at 513, citing *Dilliplaine v. Lehigh Valley Trust Co.*, 457 Pa. 255, 322 A.2d 114 (1974).

¶ 7 The court in *Criswell* distinguished between weight of the evidence claims and an objection to an inconsistent verdict. An objection to the inconsistency of the verdict must be raised when the verdict is rendered. *Id.* at 40, 834 A.2d at 508, citing *City of Philadelphia, Police Dept., supra*. In the instant case, appellants argue that the jury's determination that appellee's negligence was not a substantial factor in causing appellants' injuries was contrary to the testimony of both sides' medical experts. This is properly characterized as a challenge to the weight of the evidence, not as an objection to the inconsistency of the verdict. *Id.* at 39, 834 A.2d at 508–509 ("a verdict that finds negligence but no substantial factor is not an inconsistent verdict," quoting Judge Musmanno's concurrence in this court's panel decision). Therefore, appellants' challenge to the weight of the evidence is not waived for failure to raise it prior to the discharge of the jury.

■ ¶ 8 In determining whether the jury's verdict was against the weight of the evidence, we note our standard of review:

> A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [jury], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

*Daniel v. William R. Drach Co., Inc.*, 849 A.2d 1265, 1267–1268 (Pa.Super.2004) (citations omitted).

¶ 9 Appellants presented four experts. Dr. Mark A. Carlsson, M.D., has been Husband's family physician since 1992. (Deposition of Dr. Mark A. Carlsson, M.D., 8/21/02 at 7.) Dr. Carlsson treated Hus-

band on December 22, 1998, two days after the collision. (*Id.*) Husband complained of headaches since the accident. (*Id.*) He had not treated at the emergency room. (*Id.* at 8.) He complained of soreness in his neck and back. (*Id.*) Dr. Carlsson noted some muscle spasm in his neck and low back. (*Id.*)

¶ 10 Dr. Carlsson treated Husband with Flexeril, a muscle relaxant, and Ibuprofen, an anti-inflammatory, and eventually referred him to Dr. Munir Y. Elawar, M.D., a neurologist. (*Id.* at 8, 13–14.) Dr. Carlsson stated Husband was suffering from spinal stenosis consistent with post-traumatic arthritis. (*Id.* at 27–28.) He also reviewed x-ray films demonstrating reverse lordosis related to muscle spasm. (*Id.* at 23–25.)

¶ 11 Dr. Elawar also testified for appellants. Dr. Elawar diagnosed Husband with post-traumatic headaches. (Deposition of Dr. Munir Y. Elawar, 8/21/02 at 15.) Dr. Elawar noted that a magnetic resonance imaging (MRI) scan of the brain taken August 11, 2001 was normal. (*Id.* at 13.) Film studies documented minimal spinal stenosis from C3–4 to C5–6. (*Id.*) On cross-examination, Dr. Elawar stated there was no evidence of trauma to the head itself from the motor vehicle accident. (*Id.* at 16.) He characterized spinal stenosis as a degenerative disease, not unusual for someone of Husband's age. (*Id.* at 19–20.) There was no evidence of a disc herniation or fractured vertebra. (*Id.* at 20–21.) Dr. Elawar could not state within a reasonable degree of medical certainty that Husband's continuing headache symptoms were related to the accident. (*Id.* at 25.)

¶ 12 Dr. Michael J. Sosso, M.D., testified for appellants. Dr. Sosso is a neurologist concentrating in headache and facial pain. (Deposition of Dr. Michael J. Sosso, M.D., 2/7/03 at 7.) Husband was referred to him by Dr. Elawar. (*Id.* at 8.) Dr. Sosso diagnosed Husband with migraine headaches triggered by the accident. (*Id.* at 11–12.) He also testified Husband's depression and sleep disturbance were related to the headaches. (*Id.* at 12, 15–16.) Dr. Sosso admitted on cross-examination that his diagnoses of headaches and sleep disturbance were based on appellants' subjective reports. (*Id.* at 33–34.) A low speed impact would be less likely to cause migraine headaches. (*Id.* at 46.)

¶ 13 Dr. Robert L. Eisler, M.D., testified at trial for appellants. He is a psychiatrist who first met Husband in March of 2000. (Notes of testimony, 5/6/03 at 24.) Dr. Eisler diagnosed Husband with depression beginning after the accident. (*Id.* at 24–25.) He testified that Husband's neck pain and headaches were interrelated with his depression. (*Id.* at 25, 27.) Dr. Eisler's prognosis, five years after the auto accident, was that Husband will continue to suffer from depression indefinitely. (*Id.* at 28.)

¶ 14 Appellee, in turn, countered with her own experts. Dr. Michael D. Franzen, Ph.D., is a clinical neuropsychologist who evaluated Husband on April 10, 2002. (Deposition of Dr. Michael D. Franzen, Ph.D., 6/24/02 at 5, 12.) Dr. Franzen conducted a clinical interview and history and administered standardized tests. (*Id.* at 12.) Dr. Franzen's session with Husband lasted approximately five or six hours. (*Id.* at 13.) Several of the tests indicated Husband was consciously or unconsciously exaggerating the extent of his clinical symptoms and was not giving his best effort. (*Id.* at 25–27.) Husband reported significant distress and concern about his physical and mental functioning. (*Id.* at 28.) He reported feeling unhappy, worthless, and helpless. (*Id.*) He reported a decrease in sexual interest, loss of appetite, and decrease in weight. (*Id.* at 28–29.) Dr. Franzen diagnosed major depres-

sive disorder, single episode, status post-whiplash injury. (*Id.* at 30, 33.) Dr. Franzen noted that testing indicated Husband did not give a consistently good effort on the cognitive test and the evaluation. (*Id.* at 34.)

¶ 15 Regarding the causative effect of the automobile accident, Dr. Franzen remarked:

> The relation between the history of his involvement in the motor vehicle accident and the current condition is somewhat, as I describe it, somewhat murky, given the timeline. The accident occurred on December 20, 1998, but he didn't seek or receive psychiatric help until March of 2000. And I state that it is problematic and continues to show symptoms and appeared remote from the time of the accident and injury.

*Id.* at 36. Dr. Franzen also commented on diagnoses by other physicians contained in Husband's medical records:

> I make a statement about two diagnoses mentioned in the records but don't appear to be substantiated. One was of an obsessive compulsive disorder because when I interviewed and evaluated him, I didn't see any evidence of that. The other was a statement from his primary care physician that he was experiencing a post-traumatic stress disorder. That's not substantiated in the psychiatric records or in the interview and history with him.

*Id.* at 37. Citing to his report, Dr. Franzen stated that "injuries incurred in the accident *may have been a contributing factor* in the initiation of his depressive condition." (*Id.* at 40 (emphasis added).) When asked by defense counsel how much the accident contributed to Husband's depression, Dr. Franzen stated:

> It would be impossible to quantify that. The fact, though, that there was such a long period of time from the accident until the depression was diagnosed and first treated indicates it wasn't the primary sort of event, but certainly it would have some contribution to it.

*Id.* He then identified other contributing factors, including Husband's diabetic condition and his wife's physical problems. (*Id.* at 41.)

¶ 16 Dr. Richard Kasdan, M.D., testified for appellee. Dr. Kasdan is a board-certified neurologist and examined Husband on January 21, 2003. (Deposition testimony of Dr. Richard Kasdan, M.D., 1/29/03 at 8, 15.) Husband gave a history of an automobile accident in which the impact pushed his vehicle across the roadway. (*Id.* at 18.) Following the accident, he drove home and treated with his family physician two days later. (*Id.*) Dr. Kasdan reviewed Dr. Elawar's notes and treatment records. (*Id.* at 23.) He agreed with Dr. Elawar's initial diagnosis of post-traumatic headaches and mood changes. (*Id.* at 24.) However, Dr. Kasdan stated Husband's continuing headache symptoms were not related to the accident. (*Id.*) He agreed with Dr. Elawar's assessment that other factors such as depression and diabetes were contributing. (*Id.*) Regarding Dr. Sosso's diagnosis of migraine headaches caused by the motor vehicle accident, Dr. Kasdan testified:

> An individual migraine can be caused by trauma. The tendency to have migraines forever is not caused by trauma. I agree with Dr. Sosso that [Husband] has migraine to some degree, a mixed migraine condition, and I agree that many of these headaches came after his whiplash injury, which is what he says. He never really says that they have been caused by the whiplash and he does state that they were worsened and perpetuated by sleep disturbance, de-

pression and caffeine use, and I agree with that.

*Id.* at 27–28.

¶ 17 Dr. Kasdan conducted a physical exam which was normal. (*Id.* at 29.) He testified that while cervical strains can cause headaches, "Generally they are benign and self-limiting, meaning they hurt for a few days or a week and then they go away." (*Id.*) In Dr. Kasdan's opinion, Husband suffered a "minor soft tissue injury or cervical strain to his neck" as a result of the accident. (*Id.* at 30.) He stated that any continuing subjective complaints of migraine headaches were not related to the December 20, 1998 accident. (*Id.* at 31.)

¶ 18 Therefore, while Dr. Kasdan was willing to acknowledge, based upon Husband's history and medical records, that he suffered a minor soft tissue injury in the accident, any symptoms would have resolved shortly thereafter. He found no neurological basis for Husband's ongoing pain complaints five years after the accident.

¶ 19 Dr. Howard J. Senter, M.D., testified at two depositions for appellee. Dr. Senter is a board-certified neurological surgeon. (Deposition testimony of Dr. Howard J. Senter, M.D., 6/3/02 at 3–5.) Dr. Senter examined Husband on January 22, 2002. (*Id.* at 7.) He reviewed Husband's medical records as well as film studies of his brain and neck. (*Id.*) A CAT scan of Husband's head was normal. (*Id.* at 12.) An MRI of the neck showed some mild degenerative changes and a small bulge at the C5–6 level, but no evidence of a fracture or disc herniation. (*Id.*) Dr. Senter also examined x-rays taken approximately one month after the accident, which showed no bony fracture or straightening of the spine. (*Id.*) Dr. Senter testified that the degenerative changes or "wear and tear" seen on his cervical

spine MRI scan were completely within normal limits for a man his age. (*Id.* at 13.)

¶ 20 Dr. Senter also performed a physical examination. (*Id.* at 14.) Although Husband exhibited limited flexion, extension, and lateral rotation, Dr. Senter did not detect that it was due to muscle spasm or pain. (*Id.* at 14–15.) Dr. Senter did detect some mild voluntary restriction. (*Id.*) In addition, Husband's complaints of pain during the examination were mechanically inconsistent. (*Id.* at 15–16.) In Dr. Senter's opinion, there was no organic basis for Husband's pain complaints. (*Id.* at 20.) Dr. Senter found no evidence that Husband had suffered any structural damage to the head, neck, shoulders, or spine. (*Id.* at 23.) Dr. Senter disagreed that Husband's depressive condition could have been brought on by a whiplash injury sustained during the accident. (*Id.* at 20–23.) He also disagreed that the accident could have aggravated Husband's pre-existing diabetic condition. (*Id.* at 23.)

¶ 21 Dr. Senter testified again by deposition on October 23, 2002. Dr. Senter was recalled to rebut the testimony of Dr. Carlsson. Dr. Senter strongly disagreed with Dr. Carlsson's opinion that Husband was suffering from cervical lordosis and scoliosis as a result of the motor vehicle accident. (Deposition testimony of Dr. Howard J. Senter, M.D., 10/23/02 at 4–5.) Dr. Senter stated that cervical stenosis cannot occur from a single injury, such as a whiplash injury or a muscle sprain and strain. (*Id.* at 8.) Cervical stenosis, or narrowing of the spine, is a degenerative and not a post-traumatic condition. (*Id.* at 7.) Dr. Senter specifically disagreed with Dr. Carlsson's opinion that Husband's degenerative changes or formation of bone spurs were in any way related to the accident. (*Id.* at 9–10.) In addition, Dr. Senter stated that Dr. Carlsson, as a family

physician, was not qualified to render an expert opinion in the field of neurosurgery. (*Id.* at 12.)

¶ 22 Appellants argue Dr. Senter conceded that Husband suffered a cervical sprain/strain when he stated on cross-examination, "In this case, the cause of this patient's neck pain is a muscle and a ligament, a soft tissue injury and not acceleration or creating symptomatic any mild degenerative arthritis he has." (*Id.* at 19.) Taken in context, Dr. Senter was explaining that in his opinion, cervical stenosis or degenerative arthritis was not the cause of Husband's pain complaints. This was in response to Dr. Carlsson's report and deposition testimony. Any diagnosis of a cervical strain or sprain was based on Husband's subjective pain complaints, not objective medical evidence. (Deposition of Dr. Senter, 6/3/02 at 44–45.)

¶ 23 The force of impact was hotly contested in this case. It is not disputed that Husband drove home from the scene of the accident, did not seek emergency treatment, and did not treat with Dr. Carlsson until two days later. There was minimal damage to either vehicle. Appellee reported no damage to her vehicle. Although Husband testified he incurred approximately $900 in damage to his rear bumper, a review of the photographs reveals no visually discernible damage.

¶ 24 Husband testified he was stopped at an intersection making a left-hand turn when he heard the squealing of brakes behind him and looked in the rear-view mirror. (Notes of testimony, 5/7/03 at 45.) He turned the wheel, hoping to get off the road, when appellee struck him from behind. (*Id.*) The force of the impact pushed his car across the roadway. (*Id.*) Husband testified, "I started heading into bushes and the car was still pushing me, and I remember putting my feet back on the brake to stop me from hitting into the bushes and stopping the car." (*Id.*) Husband crossed the opposite lane of travel, and as he approached the bushes, he had both feet on the brake. (*Id.* at 45–46.)

¶ 25 After the accident, Husband exited the vehicle to ask appellee and her passengers whether they were okay, and to see whether his car was "drivable." (*Id.* at 47.) It took him a few minutes to get out of the car. (*Id.*) This testimony directly contradicts appellee's version of the events, who described the force of impact as "whenever you pull into a parking lot and do a—into a parking space and you hit one of the bumper blocks," and testified appellants' vehicle moved no more than a foot. (Notes of testimony, 5/8/03 at 43–44.)

¶ 26 Appellee estimated she was traveling approximately 15 miles per hour when she collided with the rear end of appellants' vehicle. (*Id.* at 43.) Appellee testified both vehicles remained on the roadway after the collision, with appellants' vehicle approximately one foot in front of hers. (*Id.* at 44.) After the accident, Husband turned left onto Artlee Avenue and pulled into a grassy area. (*Id.*) He was followed by appellee, who stopped on the side of the road. (*Id.*) They had a conversation, during which both Husband and appellee confirmed they were "fine." (*Id.*) After exchanging information, appellee returned to her vehicle. (*Id.* at 44–45.) She noted no damage to either vehicle. (*Id.* at 45.)

¶ 27 Appellee called Daniel R. Aerni ("Aerni"), an accident reconstructionist. Aerni testified that for Husband's vehicle to have been pushed across the opposite lane with his foot on the brake pedal, as he described, the impact would have had to have occurred at approximately 58–59 miles per hour. (*Id.* at 69.) At that speed, there would have been extensive damage to appellants' vehicle. (*Id.*) The

rear end of the vehicle would have been virtually demolished. (*Id.*)

¶ 28 Appellants argue that appellee's own medical experts conceded that Husband suffered at least some injury as a result of the accident, and therefore the jury's determination that the accident was not the cause of Husband's injuries was against the weight of the evidence. After careful review of the voluminous case law addressing this issue, under the facts of this case, we are constrained to agree.

¶ 29 In their brief, appellants cite *Kraner v. Kraner*, 841 A.2d 141 (Pa.Super.2004). In that case, the jury found the defendant negligent but determined his negligence was not a substantial factor in bringing about the plaintiff's injuries, despite testimony from the defendant's medical expert that the plaintiff had suffered a sprain to her right wrist and a neck sprain from the accident. *Id.* at 146. The jury declined to award the plaintiff damages for her injuries.

¶ 30 A panel of this court held that the verdict was against the weight of the evidence: "Because all three experts agreed that Appellant sustained some injury as a result of the motor vehicle accident, the jury erred when it disregarded the uncontroverted evidence of causation and found [defendant's] negligence was not a substantial factor in causing at least some of Appellant's injuries." *Id.*, citing *Andrews v. Jackson,* 800 A.2d 959, 965 (Pa.Super.2002). In distinguishing *Majczyk v. Oesch,* 789 A.2d 717 (Pa.Super.2001) (*en banc* ), the *Kraner* court stated that while a jury may find that the plaintiff's injuries are non-compensable despite uncontroverted medical evidence of injury, it may not find that the accident did not "cause" an injury, where liability is not at issue. *Id.* at 145, citing *Andrews, supra* at 964.

¶ 31 In *Andrews,* the defendant backed his van into the front end of the plaintiff's vehicle. The defendant's medical experts conceded that the plaintiff had suffered a soft-tissue injury (cervical strain) in the accident. The jury returned a verdict finding the defendants negligent, but also finding the negligence was not a substantial factor in causing the plaintiff's injuries. The jury awarded the plaintiff zero damages. The trial court granted the plaintiff a new trial on the issue of damages, and the defendants appealed.

¶ 32 A panel of this court affirmed, holding that the jury's verdict was contrary to the weight of the evidence adduced at trial: "Where there is no dispute that the defendant is negligent and both parties' medical experts agree the accident caused *some* injury to the plaintiff, the jury may not find the defendant's negligence was not a substantial factor in bringing about at least *some* of plaintiff's injuries." *Id.* at 962 (emphasis in original) (citations omitted). The panel distinguished this court's *en banc* holding in *Majczyk, supra:*

> Our reading of *Majczyk,* however, does not lead us to conclude that a jury may disregard uncontroverted expert witness testimony that the accident at issue did not *cause* some injury. Rather, we conclude the jury must find the accident was a substantial cause of at least some injury, where both parties['] medical experts agree the accident caused some injury. While the jury may then find the injuries caused by the accident were incidental or non-compensable and deny damages on that basis, the jury may not simply find the accident did not 'cause' an injury, where both parties' medical experts have testified to the contrary.

*Id.* at 964 (emphasis in original). Numerous decisions have followed the holding in *Andrews. See, e.g., Pentarek v. Christy,* 854 A.2d 970 (Pa.Super.2004); *Smith v. Putter,* 832 A.2d 1094 (Pa.Super.2003); *Campagna v. Rogan,* 829 A.2d 322 (Pa.Su-

per.2003); *Lemmon v. Ernst*, 822 A.2d 768 (Pa.Super.2003), *appeal denied*, 577 Pa. 722, 847 A.2d 1287 (2004); *Hyang v. Lynde*, 820 A.2d 753 (Pa.Super.2003), *appeal denied*, 577 Pa. 681, 843 A.2d 1239 (2004).

¶ 33 Based on our review of the testimony, we agree with appellants that appellee's medical experts conceded certain injuries to Husband as a result of the accident. Therefore, the jury's verdict was against the weight of the evidence, and the case law cited above compels us to remand for a new trial on damages. In fact, both appellee and the trial court agree that Husband's uncontroverted injuries included a minor cervical strain/sprain, post-traumatic headaches, and depression. (Appellee's brief at 17; trial court opinion, 9/11/03 at 5.) Of course, the severity and duration of those injuries is disputed.

■ ¶ 34 The jury obviously did not find appellants' testimony to be credible when it determined that the vehicle accident was not the cause of Husband's alleged injuries. We will limit the trial on remand to only those injuries which were uncontroverted by appellee's experts. We find *Hyang, supra,* to be instructive. In *Hyang,* the plaintiff alleged severe injuries resulting from an automobile accident in which negligence was conceded. The defense vigorously contested the major injuries but conceded that the plaintiff suffered minor back and neck strain and sprain. As in the instant case, the jury found that the accident was not a substantial contributing factor to any of the plaintiff's injuries. Following *Andrews,* a panel of this court affirmed the trial court's order granting a new trial, holding that the jury ignored the uncontroverted medical testimony; and therefore, the verdict was against the weight of the evidence. However, we limited the scope of the new trial

to providing compensation for the plaintiff's uncontroverted injuries only, *i.e.,* the neck and back strain and sprain: "It is clear that the jury discounted the *controverted* testimony of the plaintiff. The jury clearly rejected the claim that the many serious injuries claimed by [the plaintiff] resulted from the accident. There is no reason to upset that finding, and, in fact, it was not challenged." *Hyang, supra* at 756 (emphasis in original). The *Hyang* court emphasized that its decision was grounded in supreme court precedent:

This rule announced by our Supreme Court [in *Neison v. Hines,* 539 Pa. 516, 653 A.2d 634 (1995) ] indicates that it is only the *uncontested* or conceded injuries which are at issue. As the jury verdict regarding the 'major' injuries is supported by the evidence, it is only those remaining *uncontested* injuries that require resolution.

*Id.* at 757 (emphasis in original). *See also Pentarek, supra* (new trial limited to the soft tissue injuries conceded by defendant's medical expert and any derivative loss of consortium claim by plaintiff-wife; judgment affirmed as it related to plaintiff's claims of degenerative disc disease and spinal stenosis).

¶ 35 Husband's and appellee's testimony regarding the severity of the accident differed dramatically. Photographs of the vehicles after the collision reveal minimal, if any, damage. Importantly, the accident reconstructionist testified that accepting Husband's testimony as true, the damage to his vehicle would have been severe. Therefore, Husband's credibility was directly at issue. As in *Majczyk, supra,* appellants were not seeking to recover damages for a mild cervical sprain/strain. Appellants alleged serious and severe injuries as a result of the accident, including ongoing neck and back pain, depression, loss of consortium, migraine headaches,

and an exacerbation of Husband's pre-existing diabetes. Clearly, the jury did not believe these injuries were caused by the motor vehicle accident. To reverse the judgment and remand for a new, global trial on the issue of damages under the facts of this case, where there was virtually no objective evidence of injury and the jury discounted appellants' testimony, would sanction the precise scenario that this court's *en banc* holding in *Majczyk* sought to avoid.

¶ 36 We disagree with appellants' argument that Husband's injuries are so interrelated that fairness demands an entirely new trial as to all his alleged injuries. (Appellants' brief at 14–18.) Therefore, in line with this court's decisions in *Hyang* and *Pentarek,* we will vacate the trial court's order denying appellants' post-trial motions and remand for a new trial limited to only those injuries which were uncontroverted by appellee's medical experts, *i.e.,* post-traumatic headaches, depression and the cervical sprain/strain. In addition, the jury can consider any derivative loss of consortium claim by appellant-Wife.

¶ 37 We agree with Judge Doerr that both parties may present evidence regarding the accident as it relates to appellants' injuries. (Trial court opinion, 9/11/03 at 5.) As in the first trial, although liability is not at issue, the circumstances of the collision and particularly the testimony of the accident reconstructionist reflect upon Husband's credibility and the severity of his injuries. As we stated in *Mano v. Madden,* 738 A.2d 493 (Pa.Super.1999) (*en banc* ):

> We acknowledge, however, that evidence regarding the manner in which the accident occurred is relevant to the determination of damages in the present case since the accident in question involved a minor collision. Therefore, we instruct the trial court to permit both parties to present any evidence concerning the occurrence of the accident and its severity that is relevant to the issue of damages. That is to say, that while we hold that liability for fault which caused the accident has been conclusively determined, liability for injuries sustained as a result of the accident is an open and litigable issue including evidence of the dynamics of the accident.

*Id.* at 498. *Accord Smith, supra,* 832 A.2d at 1101.

¶ 38 The order of September 11, 2003, denying appellants' motion for a new trial, is vacated. Judgment reversed. Case remanded with instructions. Jurisdiction relinquished.