J. A18005/15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FLORJE AND FIDAIM VRELLA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellants | : | |
| | : | |
| v. | : | No. 1886 MDA 2014 |
| | : | |
| FRANCES WOODS | : | |

Appeal from the Judgment Entered December 9, 2014,
in the Court of Common Pleas of Lancaster County
Civil Division at No. CI-11-14137

BEFORE:  FORD ELLIOTT, P.J.E., STABILE AND MUSMANNO, JJ.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:          **FILED JANUARY 22, 2016**

Florje and Fidaim Vrella ("Vrella"),[1] plaintiffs in the court below, appeal from the judgment entered December 9, 2014.[2]  After careful review, we affirm.

---

[1] Although Fidaim Vrella brought a separate loss of consortium claim, his wife, Florje Vrella, was the allegedly injured party.  For ease of discussion, we will refer to Mrs. Vrella as "Vrella."

[2] Appellants purport to appeal from the order of October 9, 2014, denying post-trial motions.  Ordinarily, an appeal properly lies from the entry of judgment, not from the order denying post-trial motions. ***See generally, Johnston the Florist, Inc. v. TEDCO Constr. Corp.***, 657 A.2d 511, 516 (Pa.Super. 1995).  Nevertheless, a final judgment entered during pendency of an appeal is sufficient to perfect appellate jurisdiction. ***Drum v. Shaull Equipment and Supply Co.***, 787 A.2d 1050 (Pa.Super. 2001), ***appeal denied***, 803 A.2d 735 (Pa. 2002).  ***See also*** Pa.R.A.P. 905(a) (stating notice of appeal filed after court's determination but before entry of appealable order shall be treated as filed after such entry and on the day of entry).

The trial court has aptly summarized the facts of this matter as follows:

> Plaintiffs initiated this action on November 29, 2011, by filing a complaint against Defendant, Frances Woods. In their complaint, Plaintiffs set forth causes of action for negligence on behalf of Mrs. Vrella and loss of consortium on behalf of Mr. Vrella.
>
> This action arises from an automobile accident which occurred on June 27, 2010, in which Mrs. Vrella was completing a left turn at the exit ramp from Route 30 onto New Holland Avenue in Lancaster County, Pennsylvania. (Compl., ¶ 3; N.T., June 9, 2014, 12). Defendant, traveling westbound on New Holland Avenue, ran the red light and struck Mrs. Vrella's vehicle, causing it to spin around. (Compl., ¶ 4; N.T., June 9, 2014, 12).
>
> Following the accident, Mrs. Vrella was treated in the emergency room for complaints of left rib, left hip and left ankle pain. (N.T., June 9, 2014, 15). All diagnostic tests were negative and she was released the same day. (*Id.*; J. Martin Depo., 10-12). Two days later, Mrs. Vrella saw her primary care physician with complaints of left ankle and back pain. (J. Martin Depo., 10).
>
> Mrs. Vrella subsequently sought treatment from several medical specialists for a variety of complaints including head pain, dizziness, neck pain, back pain, leg pain, hip pain, numbness and tingling in her leg and memory loss. Mrs. Vrella underwent several treatments and medical procedures to alleviate her symptoms, with mixed results. (N.T., June 9, 2014, 15-23; *see also*, J. Martin Depo., 12-30; J. Argires Depo., 12-34; M. Reddy Depo., 7-38).
>
> Defendant stipulated to liability, and the issues submitted to the jury were whether Defendant's negligence was a factual cause of the harm suffered

by Plaintiffs and, if so, the amount of damages to be awarded. On June 12, 2014, the jury unanimously found in favor of Defendant by determining Defendant's negligence was not a factual cause of Plaintiffs' harm.

On June 23, 2014, Plaintiffs filed a motion for a new trial contending that the jury's verdict was against the weight of the evidence. Oral argument on Plaintiffs' motion was held on August 18, 2014. Both parties have filed briefs in support of their respective positions and the issue presented is ready for disposition.

Trial court opinion, 10/9/14 at 1-2.

Appellants' motion for new trial was denied on October 9, 2014, and this timely appeal followed. Appellants complied with Pa.R.A.P., Rule 1925(b), 42 Pa.C.S.A., and the trial court has filed an opinion.

Appellants have raised the following issue for this court's review:

Whether the judge erred in denying Plaintiffs' Motion for a New Trial in finding that the jury's determination of no factual cause for plaintiff's injuries was not against the weight of the evidence?

Appellants' brief at 5.

In determining whether the jury's verdict was against the weight of the evidence, we note our standard of review:

A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but,

- 3 -

> rather, after due consideration of the evidence found credible by the [jury], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

*Elliott v. Ionta*, 869 A.2d 502, 504 (Pa.Super. 2005), quoting *Daniel v. William R. Drach Co., Inc.*, 849 A.2d 1265, 1267-1268 (Pa.Super. 2004) (citations omitted).

As stated above, the defendant conceded liability in this case; therefore, the only issues at trial were whether the defendant's negligence caused any injury to the plaintiffs and, if so, the amount of damages. Initially, it is necessary to review the testimony in this matter, particularly that provided by the medical experts on both sides.

Jeffrey R. Martin, M.D., is Vrella's treating physician. Approximately two days after the accident, he conducted a physical examination of Vrella. (Deposition testimony of Dr. Martin ("Martin depo"), 5/29/14 at 10.) Dr. Martin noted that Vrella was complaining of pain in her left ankle and left back, but her physical exam was unremarkable. (*Id.*) Dr. Martin did not find any neurologic dysfunction. (*Id.* at 11.) Dr. Martin initially assessed her with a lumbar strain related to the accident and prescribed anti-inflammatory medication. (*Id.* at 12.)

Vrella returned to see Dr. Martin on July 21, 2010. (*Id.*) Dr. Martin reviewed some imaging studies including MRIs which were all normal. (*Id.* at 13.) At this time, Vrella was complaining of dizziness and pain in the left side of her head. (*Id.*) Again, the physical exam was normal. (*Id.* at 14.) Dr. Martin did note some diminished range of motion in her neck but that was the only finding. (*Id.*)

Vrella also complained of feeling sad and depressed. (*Id.*) According to Vrella, she was basically just staying at home with her eyes closed. (*Id.*) Dr. Martin started her on Zoloft, an anti-depressant. (*Id.* at 14-15.) Dr. Martin testified that he had treated Vrella for depression in the past, before the accident, in 2000 and again in 2007-2008. (*Id.* at 16-18.) Vrella was diagnosed with depression in 2000 following a miscarriage. (*Id.* at 45.) In December 2007, she described vague suicidal thoughts and difficulty sleeping. (*Id.*) She told Dr. Martin that ever since she was young, she would experience a state in which she felt unable to move at night and as though her body was going to fill up the entire room. (*Id.* at 46.) She also had recurring dreams of being abducted by aliens. (*Id.*) Dr. Martin testified that Vrella described incidents of both physical and sexual abuse as a child and in early adolescence. (*Id.* at 47.) Dr. Martin urged her to seek psychiatric treatment but she refused. (*Id.* at 49-50.)

Dr. Martin continued to treat Vrella off and on, every two to three months. (*Id.* at 21.) On March 28, 2011, Vrella complained of headaches

and continuing memory problems. (*Id.*) Vrella also related an incident where she woke up and did not know where she was. (*Id.*) Vrella described feeling confused, and as though "her body fills the room and she cannot move." (*Id.* at 22.) Dr. Martin testified that it sounded to him like a dissociative state, which can occur in people who suffer from depression or post-traumatic stress disorder ("PTSD"). (*Id.*) Dr. Martin ordered an EEG, a brain wave scan, which was unremarkable. (*Id.*) Dr. Martin recommended that Vrella seek treatment with a psychologist. (*Id.* at 22-23.) Dr. Martin testified that in the past, she has been reluctant to seek psychiatric treatment, saying she does not want to be thought of as a "crazy person." (*Id.* at 23.)

In February and August 2012, Dr. Martin's records indicate that Vrella's pain complaints may have been psychosomatic. (*Id.* at 31-32.) Dr. Martin agreed that he could not find an organic cause of her pain complaints. (*Id.* at 76.) Dr. Martin agreed that Vrella's complaint of pain in her sacroiliac ("SI") joint could be the result of a somatoform condition (*i.e.*, psychological); however, in his opinion, it is more likely that there was some underlying pain and discomfort which was exacerbated by the motor vehicle accident. (*Id.* at 41-42, 77-78.) Dr. Martin testified that the persistent pain in the SI joint did not seem to manifest itself until after the accident. (*Id.* at 41-42.)

Regarding Vrella's chronic pain syndrome, Dr. Martin opined,

> Again, it's hard to say with complete certainty because there are, I do believe that she had some musculoskeletal issues related to the motor vehicle accident. The chronic pain syndrome, which can be related to a combination of those musculoskeletal pain issues and, you know, her ability to deal with those issues or the past history of trauma. So, again, somebody who has a history of trauma, it can be re-triggered during a traumatic event and it can make it really difficult for somebody to improve and get better.

*Id.* at 40-41.

Madhavi R. Reddy, M.D., an anesthesiologist and pain management specialist, also treated Vrella. Dr. Reddy diagnosed her with SI joint dysfunction and myofascial pain syndrome. (Deposition testimony of Dr. Reddy ("Reddy depo"), 5/30/14 at 38.) Dr. Reddy agreed that the "gold standard" for diagnosis of an SI joint dysfunction is injection of the SI joint. (*Id.* at 47.) The joint dysfunction is confirmed when the patient reports significant relief from pain following the injection. (*Id.* at 48.) In Vrella's case, they injected the SI joint with no reduction in pain. (*Id.* at 50.) Dr. Reddy also conceded that Vrella had a leg length discrepancy, *i.e.*, one of her legs is shorter than the other, which could be putting pressure on the SI joint. (*Id.* at 47.)

James P. Argires, M.D., a neurosurgeon, also testified on behalf of Vrella. Dr. Argires first treated Vrella on July 29, 2010. (Deposition testimony of Dr. Argires ("Argires depo"), 6/3/14 at 12.) Dr. Argires reviewed multiple studies including MRIs of the brain, cervical spine, thoracic

spine, and lumbar spine; there were no significant findings. (***Id.*** at 15.) Dr. Argires also conducted a physical exam. (***Id.***) There were no objective findings. (***Id.*** at 16.) Dr. Argires diagnosed a soft-tissue injury, a myofascial strain. (***Id.*** at 17.) Dr. Argires also diagnosed an aggravation of a pre-existing degenerative process at L4/5, between the fourth and fifth vertebra in the lower back area. (***Id.*** at 18.) Dr. Argires recommended physical therapy and medication, conservative management. (***Id.*** at 25.)

Later, in August 2010, Vrella returned for a follow-up visit, complaining of lower back pain into the left buttock. (***Id.*** at 26.) Dr. Argires ordered a bone scan of the entire spine which was unremarkable. (***Id.*** at 28.) Dr. Argires considered an SI joint dysfunction and referred her to Dr. Westphal. (***Id.*** at 28-29.) Dr. Argires also referred her to Dr. Trevin Thurman for an injection of her SI joint under fluoroscopy. (***Id.*** at 29-30.)

Vrella returned in September 2010. (***Id.*** at 30.) She still reported pain; however, an MRI of her left hip was normal. (***Id.*** at 31.) The SI joint injection by Dr. Thurman did not result in major improvement. (***Id.*** at 55.) Vrella treated with Dr. Westphal on October 8, 2010. (***Id.*** at 58.) Dr. Westphal reviewed x-rays of the SI joint which appeared normal. (***Id.*** at 59-60.) Dr. Westphal made a reference to "symptom amplification." (***Id.*** at 60.) Dr. Westphal also noted disproportionate pain with hip flexion, abduction, extension, which Dr. Argires testified "means what he thought in

terms of her pain pattern and what he saw physically didn't quite match up." (*Id.*) Dr. Westphal's records state, "I have suggested that she give it time to heal. She already has an attorney. I suspect there is some symptom amplification and hope that with resolution of her case her pain will go away." (*Id.* at 61.)

Vrella also presented the testimony of Cynthia Socha-Gelgot, Ph.D., a neuropsychologist. Dr. Socha-Gelgot saw Vrella on May 8, 2013. (Deposition testimony of Dr. Socha-Gelgot ("Socha-Gelgot depo"), 6/4/14 at 11.) Vrella reported that after the accident, she had a lot of physical, cognitive, and behavioral changes and was not able to report back to work since that time. (*Id.* at 15.) Vrella complained of memory loss, feeling hopeless, suicidal ideation, irritability, and fatigue. (*Id.* at 17.) According to Dr. Socha-Gelgot, Vrella reported persistent and worsening memory problems, chronic headaches, panic attacks, recurring nightmares about the accident, and pain in her hip, neck, and knee. (*Id.* at 19.) Dr. Socha-Gelgot diagnosed her with major depressive disorder and PTSD resulting from the motor vehicle accident. (*Id.* at 35.) Dr. Socha-Gelgot testified that, "the motor vehicle accident certainly seemed to be a marker for these symptoms to develop. She was functioning well as far as I know [. . .] and seemed to be thriving." (*Id.* at 35-36.)

Dr. Socha-Gelgot testified that there is no definitive test for PTSD. (*Id.* at 58.) Clinicians have to rely on self-reporting. (*Id.*)

Dr. Socha-Gelgot testified that the MMPI, a personality and mood inventory, is helpful to further support a diagnosis of PTSD; however, they were unable to administer it due to Vrella's limited ability to read and write in the English language (Vrella is a native of Kosovo). (*Id.* at 22, 58.) On cross-examination, Dr. Socha-Gelgot admitted that Vrella did not report any prior history of depression, anxiety, or PTSD diagnosis. (*Id.* at 54.) Dr. Socha-Gelgot was not aware that Vrella had been diagnosed with PTSD in 2007, prior to the accident. (*Id.*) Vrella did not tell Dr. Socha-Gelgot about repeated physical and sexual abuse as a child and adolescent, or recurring nightmares since she was a child. (*Id.*)

Appellee presented two expert witnesses, Peter C. Badgio, Ph.D., and Lee Harris, M.D. Dr. Badgio is a neuropsychologist and evaluated Vrella on November 20, 2013. (Deposition testimony of Dr. Badgio ("Badgio depo"), 6/2/14 at 16.) Vrella minimized any prior psychological difficulties and denied having received mental health treatment in the past. (*Id.* at 20.) Vrella attributed all of her current problems, including losing the ability to read and write both in English and in her native Albanian, to the accident. (*Id.* at 20-21.) Vrella denied any history of emotional difficulties or PTSD. (*Id.* at 21.) Dr. Badgio specifically asked Vrella about any history of trauma and abuse, which she denied. (*Id.*)

Dr. Badgio noted Dr. Martin's records which contained extensive documentation of Vrella's depression, PTSD, a history significant for sexual

abuse as a child, wartime trauma in Vrella's native Kosovo before she immigrated to the United States, and a psychosomatic basis for many of Vrella's subjective pain complaints. (*Id.* at 28-31.) He noted that Dr. Martin recommended counseling but Vrella refused. (*Id.* at 35-36.) Dr. Badgio also observed that Dr. Westphal, one of Dr. Argires' colleagues, could not find anything objectively wrong with Vrella's left hip and was concerned with symptom magnification. (*Id.* at 39-40.)

Dr. Badgio disagreed with Dr. Socha-Gelgot's diagnosis of PTSD as a result of the motor vehicle accident. (*Id.* at 55.) Dr. Badgio testified that Vrella's "wildly inconsistent" performances on cognitive tests could not be caused by PTSD or a mild head injury. (*Id.* at 54-55.) Dr. Badgio testified,

> [PTSD] can indeed interfere with conversation or memory. Somebody could overall be performing a little below their true abilities because of PTSD. But one wouldn't get these wild fluctuations. These wild fluctuations are more consistent with the psychosomatic presentation, the somatoform disorder that others have recognized that Mrs. Vrella is having where she's presenting dramatic neurological symptoms or what appear to be neurological symptoms which are really not neurological in origin, like a pseudoseizure or severely impaired test performance. And my emotional testing bears that out. Dr. Socha-Gelgot didn't do much emotional testing. She just gave a symptom checklist for depression, a very brief checklist. I gave that checklist as well and Mrs. Vrella endorsed severe symptoms of depression. But I also gave a psychometric test specifically designed for diagnosis of [PTSD], as well as a much more general test of personality and emotional functioning. On that latter test, the more general test, the performances were -- her

> responses were too inconsistent to yield valid results, although there were signs of exaggeration. On the test for [PTSD], she certainly has endorsed some symptoms of [PTSD], but the overall profile did not fit a complete diagnosis of [PTSD]. And, again, we see some signs of exaggeration of those complaints. But what's prominent are signs of psychosomatic focus, and then that's true of all of the testing. That's consistent with the history in the records.

*Id.* at 55-57. In addition, Dr. Badgio testified that Vrella was giving suboptimal effort:

> Well, the effort, and that brings us back to the cognitive testing a little bit, some of the tests that we include in the cognitive battery are really -- they look like regular memory tests, but they're really just designed to see whether or not a person is giving their best effort. And Mrs. Vrella's effort was suboptimal. She failed the symptom validity tests, which only confirms what we can see in other indications that her test performance does not represent a true picture of her brain related abilities.

*Id.* at 57.

Dr. Badgio testified that the medical records do not contain any indication of a traumatic brain injury or significant concussion at the time of the accident. (*Id.* at 25-26.) According to EMS, Vrella was fully alert and her mental status was completely intact. (*Id.* at 26.) The ambulance crew gave Vrella a perfect score, 15/15, on the Glasgow Coma Scale, as did the emergency room staff. (*Id.*) There was nothing that led the emergency department staff to think that Vrella suffered a concussion or traumatic brain injury. (*Id.*) Furthermore, Dr. Badgio testified that Vrella's complaints of

progressively worsening cognitive difficulties, to the point where she can no longer read or write, are inconsistent with a traumatic brain injury such as a concussion:

> From the point of view of the question of brain injury from a neuropsychology perspective of what might in an accident cause cognitive problems, we want to look at the effects of the injury right at the time of the accident to determine whether or not it caused the brain injury and also to understand the cause of any ongoing problems. We know that problems caused by a brain injury are at their worst immediately following the accident and then get worse [sic] over time. I'm sorry. And then get better over time. In Mrs. Vrella's case her problems have gotten worse over time. But if her problems are due to a head injury, they should get better over time.

*Id.* at 24-25.

Ultimately, in Dr. Badgio's opinion, Vrella did not sustain any psychological or neuropsychological injury as a result of the accident. (*Id.* at 58.) Rather, she has a psychosomatic illness related to early childhood trauma. (*Id.*) Dr. Badgio testified that, in his opinion, the accident has served as a socially acceptable mechanism for Vrella to express pre-existing psychosomatic illness:

> What's changed is her explanation. She doesn't have any neuropsychological problems or any psychological problems caused in any way by this accident, but this accident has now given her an explanation, a validation, for being able to express all of the psychological problems that she had before. Remember before she had this accident Dr. Martin recognized that she had psychological problems related to a very, very unfortunate and

- 13 -

> traumatic past, but she had to keep a lid on it. She had to hold that inside for fear of what the repercussions might be in her culture and in her marriage if she divulged these problems. Now the accident has come along and she's now focusing on the accident as the cause of all of her problems, denying her past. And through the accident she can for the first time express the emotional pain and the suffering that she's always been trying to keep a lid on.

*Id.* at 58-59.

Dr. Badgio clarified that a somatoform disorder does not suggest an intent to deceive or that the patient is faking the symptoms; rather, it means the patient is expressing indirectly an underlying psychological problem in a physical way. (*Id.* at 70.) Dr. Badgio also expressed no opinion regarding Vrella's SI joint dysfunction. (*Id.* at 69.)

Dr. Harris is board-certified in neurology and clinical neurophysiology, as well as electrodiagnostic medicine. (Deposition testimony of Dr. Harris ("Harris depo"), 5/29/14 at 7.) Dr. Harris conducted an independent medical examination of Vrella on October 10, 2013. (*Id.* at 15.) As did Dr. Badgio, Dr. Harris testified that Vrella's complaints of progressively worsening cognitive functioning post-accident did not make much sense from a medical perspective:

> If someone has a head injury or brain injury as a result of some traumatic incident, the severity would be the maximum at the very beginning and then gradually improve or stabilize over time. So the fact that she said she didn't have any problems with her memory initially, but it began somewhat later and then got progressively worse, that's precisely the

> opposite of what one would expect with a brain injury. And, therefore, it couldn't possibly be related to any injury sustained as a result of this accident.

*Id.* at 18.

Dr. Harris testified that Vrella described her prior medical history as unremarkable. (*Id.* at 21.) She did not reveal her history of depression and PTSD, or that she had been prescribed medication for depression before the accident. (*Id.*) In fact, Vrella stated that she had never been sick in her life before the accident. (*Id.*) Vrella complained of low back pain radiating down into her left leg which could not be confirmed by objective testing. (*Id.* at 19-20.) Dr. Harris did note a July 2010 MRI of the cervical spine which showed a tiny central disc bulge at the C5-6 level which did not cause any compression of the spinal cord. (*Id.* at 31.) There was no herniated disc or narrowing of the spinal column. (*Id.*) In Dr. Harris' opinion, this was essentially a normal finding and was not of traumatic origin, rather, the result of a natural degenerative process. (*Id.*) MRIs of the lumbar and thoracic spine were normal. (*Id.*) July 2010 CAT scans of the head, neck, and back were normal. (*Id.* at 33-34.) Dr. Harris testified that diagnostic testing did not reveal any injury attributable to the accident; all tests were normal except for some minor degenerative arthritis. (*Id.* at 34.)

Dr. Harris conducted a physical examination of Vrella which was normal. (*Id.* at 44-48.) Dr. Harris did note some symptom amplification during testing:

> Well, this would be similar to what another treating physician described as pseudoparesis or psychologically-induced weakness. It means the person is not giving their full effort. They are either exaggerating, trying to convince me they are weak, or they might think they are week [sic] on a psychological basis, yet when I test them with other maneuvers, like having her walk and bear body weight on heels and toes, quite obviously I could tell that the muscles were, in fact, normally strong.

*Id.* at 46. In short, there were no objective findings from extensive diagnostic testing to support Vrella's subjective pain complaints. (*Id.* at 48-49.) Furthermore, Dr. Harris' examination was inconsistent with someone who has been as physically inactive as Vrella claimed. (*Id.* at 49.) Dr. Harris documented no objective muscle weakness despite Vrella's claim that she had been lying around the house all day for years since the accident and could not even get up to open the front door. (*Id.*) Dr. Harris found nothing neurologically wrong with her. (*Id.*) When asked whether Vrella sustained any injuries as a result of the accident, Dr. Harris testified:

> Well, from the history she provides -- that is, from the subjective standpoint -- her report of neck and back pain following the accident could provide historical support for a soft tissue sprain and strain, something that ordinarily would be expected to entirely heal or resolve within a few weeks to at most a few months following the accident.

*Id.* at 50.

> Well, apart from the possibility that she might have sustained a soft tissue sprain and strain, which would be expected to have resolved within a few months, all the extensive diagnostic testing that she underwent was entirely normal or at worst

> demonstrated some minor unrelated degenerative change. There simply isn't any evidence she sustained any physical injury. She should have been able to function normally and get back to work within a few weeks to a few months. If there were any strain and sprain it would certainly have healed by that time.

*Id.* at 53.

*Andrews v. Jackson*, 800 A.2d 959 (Pa.Super. 2002), *appeal denied*, 813 A.2d 835 (Pa. 2002), and *Bostanic v. Barker-Barto*, 936 A.2d 1084 (Pa.Super. 2007), are instructive. In *Andrews*, the front end of the plaintiff's vehicle was crushed when a moving van backed into him. *Andrews*, 800 A.2d at 960. The defense medical expert conceded that the plaintiff suffered a soft-tissue injury (cervical strain) in the accident, although he disagreed that the accident aggravated the plaintiff's prior conditions including spinal stenosis. *Id.* at 961. The jury returned a verdict finding the defendants negligent, but that the negligence was not a substantial factor in causing the plaintiff's injuries, and awarded zero damages. *Id.*

The trial court granted the plaintiff a new trial on the issue of damages, finding that both parties' medical experts had agreed that the plaintiff suffered some injury as a result of the accident, and therefore, the jury's verdict was contrary to the weight of the evidence adduced at trial. *Id.* On appeal, this court affirmed, stating,

> Where there is no dispute that the defendant is negligent and both parties' medical experts agree the

accident caused **some** injury to the plaintiff, the jury may not find the defendant's negligence was not a substantial factor in bringing about at least **some** of plaintiff's injuries. ***See Neison v. Hines***, 539 Pa. 516, 521, 653 A.2d 634, 637 (1995); [***Mano v. Madden***, 738 A.2d 493 (Pa.Super. 1999) (***en banc***)]. ***Compare Henery v. Shadle***, 443 Pa.Super. 331, 661 A.2d 439 (1995), ***appeal denied***, 542 Pa. 670, 668 A.2d 1133 (1995); ***Holland v. Zelnick***, 329 Pa.Super. 469, 478 A.2d 885 (1984). Such a verdict is contrary to the weight of the evidence adduced at trial. ***See Neison***, ***supra***; ***Mano***, ***supra***. In other words, "a jury is entitled to reject any and all evidence up until the point at which the verdict is so disproportionate to the uncontested evidence as to defy common sense and logic." ***Neison***, ***supra*** at 521, 653 A.2d at 637.

***Id.*** at 962 (emphasis in original). The court in ***Andrews*** distinguished ***Majczyk v. Oesch***, 789 A.2d 717 (Pa.Super. 2001) (***en banc***), in which this court concluded that the jury may decide that the plaintiff's injuries are non-compensable despite uncontroverted medical evidence of injury. ***Id.*** at 963-964.

Here, both parties' medical experts agreed that Appellee sustained some injury as a result of the accident. ***See Mano***, ***supra***; ***Neison***, ***supra***. Therefore, the jury was not permitted to disregard the uncontraverted [sic] evidence of causation and find Appellant's negligence was not a substantial factor in causing at least some injury to Appellee. ***Id.*** Had the jury found the accident caused some injury to Appellee, but declined to award damages because the jury concluded the injury was so minor as to be noncompensable, we would not have disturbed their verdict. ***See Majczyk***, ***supra***. ***See also Davis v. Mullen***, 565 Pa. 386, 773 A.2d 764 (2001) (holding jury may refuse to award damages for pain and suffering even-though jury found defendant's negligence caused plaintiff injury).

> However, the jury's verdict that Appellee was not "injured" in the accident goes against the weight of the competent evidenced [sic] adduced by both parties' medical experts at trial. ***See Mano***, ***supra***; ***Neison***, ***supra***.

***Id.*** at 965. ***See also Elliott v. Ionta***, ***supra*** (remanding for new trial limited to only those injuries which were uncontroverted by the defendant's experts, where the defendant's medical experts conceded certain injuries to plaintiff-husband as a result of a rear-end collision including a minor cervical strain/sprain, post-traumatic headaches, and depression).

Similarly, in ***Bostanic***, ***supra***, it was undisputed that the defense expert conceded some injury to the plaintiff resulting from the accident, ***i.e.***, a cervical sprain or strain injury. ***Bostanic***, 936 A.2d at 1089. The defense expert did dispute the other, more serious diagnoses of thoracic outlet syndrome, permanent decreased range of motion in the spine and arms, etc. ***Id.*** Following ***Andrews***, the court in ***Bostanic*** held that given the concession of injury made by the defense expert, the jury finding that the defendant's negligence was not a factual cause in bringing about the plaintiff's harm was against the weight of the evidence. ***Id.***

Appellants argue that in this case, appellee's experts conceded that Vrella suffered some injury as a result of the accident, including strains and sprains and SI joint dysfunction. We disagree. As detailed above, there was simply no objective medical evidence of injury. All the imaging studies were negative, with the exception of some minor degenerative changes unrelated

to the accident. There was simply nothing to support Vrella's subjective pain complaints. In fact, several doctors found evidence of symptom amplification or exaggeration, and both defense experts testified that if Vrella had sustained a head injury in the accident, her cognitive symptoms including loss of memory would be improving, not getting worse, over time.

Regarding the SI joint dysfunction, again, the MRIs were normal. There was testimony that Vrella received SI joint injections without significant relief, which would indicate that the source of her pain was not the SI joint. There was also evidence that Vrella had a congenital leg length discrepancy which could explain her SI joint pain. (Martin depo at 24-25; Reddy depo at 47.)

Appellants point to the testimony of Dr. Harris that Vrella could have suffered a soft tissue sprain or strain which would have resolved within a few months' time. Taken in context, it is clear Dr. Harris does not believe Vrella suffered any injury as a result of the accident, but has to acknowledge the patient history as reflected in the records. Dr. Harris found no objective evidence of injury. At best, his testimony could be considered equivocal on the issue of whether Vrella sustained some sort of soft tissue injury in the accident which resolved shortly thereafter. (*See* Harris depo at 50 ("from the history she provides -- that is, from the subjective standpoint -- her report of neck and back pain following the accident could provide historical support for a soft tissue sprain and strain" (emphasis added)); *id.* at 53

("There simply isn't any evidence she sustained any physical injury.").) This distinguishes the instant case from the **Andrews** line of cases, where the defendant's medical experts clearly conceded that the plaintiff suffered at least some injury as a result of the accident. Here, Dr. Harris testified that, "If there were any strain and sprain it would certainly have healed by that time [(within a few weeks to a few months)]." **Id.** This is not the same thing as conceding injury. As the **Andrews** court remarked, in distinguishing **Henery**, **supra** and **Holland**, **supra**:

> In **Henery** and **Holland**, the experts for both sides disagreed that the accidents in question caused the soft tissue injuries alleged. Although the defense experts in both cases conceded that a soft tissue injury "could have" or "may have" been caused by the accidents, neither expert conceded the accident actually caused any soft tissue injuries. Thus, the juries in **Henery** and **Holland** were justified in finding the accidents did not cause the plaintiffs' injuries, as this finding did not contradict a consensus among the medical experts that the accident caused some injury.

**Andrews**, 800 A.2d at 963. **See also VanKirk v. O'Toole**, 857 A.2d 183 (Pa.Super. 2004) ("if the defense expert concurs with the opinion of the plaintiff's expert only because of subjective complaints of the plaintiff, and the defense convinces the jury that the plaintiff was not truthful, the basis of

both of these diagnoses might fail and a zero verdict would be appropriate"),

citing **Kennedy v. Sell**, 816 A.2d 1153, 1159 (Pa.Super. 2003).[3]

Obviously, in this case, the plaintiff had a credibility problem. Aside from the testimony regarding symptom amplification/suboptimal effort on testing, she failed to divulge her complete medical history including diagnoses of depression and PTSD predating the accident. (**See** trial court opinion, 10/9/14 at 20 ("At trial, Mrs. Vrella admitted she had been treated for depression, despite denying it in her deposition testimony."), citing notes of testimony, 6/9/14 at 9-10, 35-38.) As the trial court observes, the jury had the opportunity to evaluate each piece of evidence, including Vrella's testimony and the video depositions of the experts, and were free to believe all, part, or none of the evidence presented. (Trial court opinion, 10/9/14 at 20.) **See VanKirk**, 857 A.2d at 185 ("the jury is free to disbelieve the plaintiff's subjective complaints, any diagnoses based on subjective complaints, and the plaintiff's doctor's opinions and conclusions").

For these reasons, we determine the trial court did not err in refusing to grant a new trial. While acknowledging Vrella's subjective complaints of pain, the defense experts never actually conceded that she suffered any injury as a result of the accident. Her objective findings on physical

---

[3] In **VanKirk**, the defendant conceded that the accident did cause some injury, although the nature and extent of the injury was hotly debated. **Id.** at 185 n.1. The jury found that the plaintiff's injuries were not severe enough to warrant compensation. **Id.** at 185.

examination were normal. It is clear from several experts' testimony that they felt the patient was exaggerating her symptoms and that her pain complaints were inconsistent. Vrella's own family doctor, Dr. Martin, characterized her ongoing symptoms as psychosomatic. The jury's finding that the accident was not a factual cause of Vrella's injuries was not against the weight of the evidence.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/22/2016